Cite as 2026 Ark. App. 212

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-25-417

| | |
|---|---|
| | Opinion Delivered April 1, 2026 |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES DIVISION OF PROVIDER SERVICES AND QUALITY ASSURANCE/OFFICE OF LONG-TERM CARE<br><br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, THIRD DIVISION [NO. 60CV-24-3363] |
| V.<br><br>BERTHA MCWILLIAMS | AGENCY DECISION AFFIRMED; CIRCUIT COURT DECISION REVERSED |
| APPELLEE | |

**KENNETH S. HIXSON, Judge**

This is an appeal under the Administrative Procedure Act (APA). Appellant Arkansas Department of Human Services Division of Provider Services and Quality Assurance/Office of Long-Term Care (DHS) appeals from an order of the Pulaski County Circuit Court that reversed the decision of an administrative law judge (ALJ) and removed appellee Bertha McWilliams' name from the Adult and Long-Term Care Facility Resident Maltreatment Central Registry (maltreatment registry). In the administrative proceeding, the DHS Office of Appeals and Hearings ALJ found that McWilliams was negligent in her responsibility to care for long-term-care-facility residents and ordered that her name be placed on the

maltreatment registry. The circuit court reversed the ALJ's decision because it found that the ALJ's order was made under an erroneous standard of care.

On appeal, DHS argues that (1) the ALJ's decision was supported by substantial evidence, (2) the ALJ's decision was not arbitrary or capricious, and (3) the circuit court erred in reversing the ALJ's order. We agree with DHS's arguments. Therefore, we affirm the ALJ's decision and we reverse the order of circuit court.

I. *Standard of Review*

This court's review under the APA is directed not toward the circuit court but toward the decision of the administrative agency. *Baldwin v. Ark. Dep't of Transp.*, 2025 Ark. App. 114, 708 S.W.3d 793. This is so because administrative agencies are better equipped by their specialization, experience, and more flexible procedures to determine and analyze legal issues affecting their agencies. *Id.*

An appellate court's review of administrative decisions is limited in scope. The appellate court may reverse or modify an agency's decision if it concludes that the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error or law; (5) not supported by substantial evidence of record; or (6) arbitrary, capricious, or characterized by abuse of discretion. Ark. Code Ann. § 25-15-212(h) (Repl. 2024).

It is not the role of the appellate court to conduct a de novo review of the record; rather, review is limited to ascertaining whether there is substantial evidence to support the agency's decision or whether the agency's decision runs afoul of one of the other criteria set out in the APA. *Ark. Contractors Licensing Bd. v. Pegasus Renovation Co.*, 347 Ark. 320, 64 S.W.3d 241 (2001). The pertinent question is whether there is relevant evidence that a reasonable mind might accept as adequate to support the agency's conclusion; the issue is not whether the appellate court would have made a different decision but whether reasonable minds could conclude as the agency did. *Jones v. Ark. Loc. Police & Fire Ret. Sys.*, 2018 Ark. App. 287, 550 S.W.3d 27. The supreme court has held that where the agency's decision is supported by substantial evidence, it automatically follows that it cannot be classified as unreasonable or arbitrary. *Collie v. Ark. State Med. Bd.*, 370 Ark. 180, 258 S.W.3d 367 (2007). I addition, the credibility and the weight of the evidence are within the agency's discretion, and it is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord that evidence. *Williams v. Ark. State Bd. of Physical Therapy*, 353 Ark. 778, 120 S.W.3d 581 (2003).

## II. *Relevant Facts*

McWilliams, a registered nurse, began working as the director of nursing for Legacy Health and Rehabilitation (Legacy Health)—a long-term care facility—in November 2022. When she was hired, McWilliams signed a written "Job Description" confirming that she understood the job description and its requirements. Among McWilliams' essential job duties were administrative functions that included developing, implementing, and directing

the nursing-services department, its programs and activities, and ensuring compliance with federal and state law. McWilliams was also charged with personnel functions that included recruiting, hiring, and terminating nursing-services personnel. Pertinent to this appeal, McWilliams' essential job duties also included nursing-care functions that specifically required her to "monitor residents' treatment and medications to ensure residents are receiving proper care," "review clinical records to ensure proper documentation is maintained related to residents' treatment, medication, and conditions," and "provide direct nursing care as necessary."

On May 2, 2023, a Legacy Health resident, C.L., was hospitalized and underwent surgery to treat a wound noted to be black and necrotic. After a complaint was lodged, DHS surveyors went to the facility and discovered that some of the residents, which included C.L., R.A., and W.W., were not receiving proper wound care as ordered by their physicians. On July 6, 2023, Legacy Health submitted an "Incident and Accident Report" and a "Facility Investigation Report" to DHS listing the three residents noted above as the victims of suspected neglect and naming McWilliams as the alleged perpetrator.

Upon receipt of the reports from Legacy Health, DHS conducted an investigation of the suspected maltreatment of residents C.L., R.A., and W.W.[1] The investigation was conducted by DHS investigator Michelle Bishop and included a review of the investigative

---

[1]The Adult and Long-Term Care Facility Resident Maltreatment Act, Ark. Code Ann. §§ 12-12-1701 et seq. (Repl. 2016 & Supp. 2025), provides at § 12-12-1710(b)(2) that DHS "shall investigate all cases of suspected maltreatment of a long-term care facility resident."

4

documents provided by Legacy Health as well as interviews with multiple individuals, including McWilliams.

After completing her investigation, Bishop prepared an investigative report on August 22, 2023. Bishop's report included the relevant statutory provisions under Ark. Code Ann. § 12-12-1703:

(17) "Neglect" means:

. . . .

(B) An act or omission by a caregiver responsible for the care and supervision of an endangered person or an impaired person constituting:

(i) Negligently failing to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered person or an impaired person;[2]

. . . .

(iii) Negligently failing to carry out a treatment plan developed or implemented by the facility;

. . . .

(18)"Negligently" means a person's failure to exercise the degree of care that a person of ordinary prudence would have exercised in the same circumstances[.]

In Bishop's report, she stated that she had interviewed Latisha Holder, a treatment nurse at Legacy Health. Holder stated that she administered wound care to the residents during the weekdays but that on the weekends when she was off work, these duties were not being performed. Holder stated further that during the weekends, McWilliams would "click

_____

[2]Subdivision (10)(B) of the statute provides that a long-term care facility resident is presumed to be an impaired person.

on" the "Treatment Administration Record" (TAR) that wound care had been administered when the treatments had not been performed. Holder stated that she reported to her administrator and to the corporate office that bandages were not being changed and wound care was not being administered, and she sent screenshots of residents' bandages that had not been changed since her last shift. Holder stated that she quit her job at Legacy Health "because she was not getting anything done and did not want to be blamed for something she was trying to tell them wasn't being done."

Bishop also interviewed Legacy Health residents R.A. and W.W. Resident R.A. was supposed to be receiving daily wound treatments to his sacrum area, and he stated that Holder administered the treatments when she was there but that when she was not there on the weekends, he would not receive the treatments. When asked whether McWilliams had ever administered is treatments, R.A. replied, "[M]aybe one time." However, on the TAR it showed that McWilliams had performed wound care on R.A. seven times between April and May 2023. W.W. told Bishop that Holder had administered his wound-care treatments on his toe but that McWilliams had never done so. However, on the TAR it showed that McWilliams had performed wound care on W.W. five times between April and May 2023. W.W. stated that he had to be put in a cast and was sent to the hospital to treat his wound.

Shyann Holbrook, a certified nursing assistant employed by Legacy Health, was also interviewed during the investigation, and she stated that Holder would clean and re-dress wounds but that she never saw McWilliams performing wound care. Another certified nursing assistant at the facility, Mary Taylor, stated that she witnessed Holder doing wound

care "all the time" but that no one was doing it on the weekends. In the investigative report, Bishop noted that McWilliams was terminated by Legacy Health for not ensuring that residents were receiving treatments.

At the conclusion of the investigation, Bishop suspected long-term care maltreatment. In Bishop's report, she recommended that the allegations of neglect against McWilliams be founded under Ark. Code Ann. § 12-12-1703(B)(i) and (iii) for failing to provide the residents with the necessary treatment as ordered and by failing to ensure the treatment was being performed.

As required by Ark. Code Ann. § 12-12-1715(b), on September 5, 2023, McWilliams was notified by letter that the allegations of neglect against her had been validated. In the letter, McWilliams was informed that a founded report of facility employee neglect would be entered on the maltreatment registry if she did not appeal within thirty days.

On September 25, 2023, McWilliams submitted a notice of appeal and request for an administrative hearing. McWilliams attached a narrative wherein she stated that the nursing staff at Legacy Health was understaffed and that she would come in on weekends to help the charge nurses with their assigned treatments. However, she blamed the primary wound-care-treatment nurse, Holder, for the deficiency in treating the residents' wounds. McWilliams stated that Holder had indicated on the TAR that wounds were healed when the wounds were still active. McWilliams stated that she should not be held accountable for "those who were actually responsible for wound care not being completed."

III. *The Agency Proceedings*

On January 30, 2024, an administrative hearing was held before an ALJ of the DHS Office of Appeals and Hearings. There were three witnesses to testify at the hearing: Deana Fears, the administrator of Legacy Health; Bishop, the DHS investigator; and McWilliams.

Fears testified that her job as administrator includes dealing with family members and residents and making rounds to ensure everyone is doing their job and following proper procedures. Fears stated that McWilliams' job duties included overseeing the nurses and certified nursing assistants and "anything that was going on clinically with the residents." Fears also stated that when there was no registered nurse on duty, McWilliams would sometimes come in on weekends and administer treatments, which included wound care for R.A. and W.W.

Bishop testified about her investigation of the alleged neglect committed by McWilliams. Bishop testified that during her interview with Nurse Holder, she learned that residents R.A. and W.W. were not receiving the necessary wound care on the weekends despite McWilliams indicating on the TAR that the treatments were being administered. When Holder would begin her work at the beginning of the week, she would see that the same bandages were on the residents. Bishop testified further that during her interviews with R.A. and W.W., these residents confirmed that that they had not been receiving treatments on the weekend as charted in the TAR.

McWilliams testified that she had been a long-term care nurse for thirty-seven years and that there had never before been any allegations of neglect or any disciplinary action taken against her. McWilliams stated that her job as director of nursing at Legacy Health

required her to oversee the nurses and the clinical operations at the facility. She stated further that she would sometimes come in on weekends and perform treatments, which included wound care for R.A. and W.W. McWilliams stated that Holder had incorrectly documented on the TAR that these residents' wounds had healed when they had not, and that despite these false representations by Holder, McWilliams knew these residents needed wound care, and she administered it on the weekends. McWilliams stated further that she always charted her treatments on the TAR and that she has never documented a treatment that she did not perform. McWilliams had no explanation for why these residents would say she did not perform their wound care, and she stated that she performed every treatment that she documented.

At the conclusion of the administrative hearing, the parties made closing arguments. DHS argued that because facility residents had reported that McWilliams failed to perform the treatments that she had documented, this constituted negligence under the relevant statutory provisions. McWilliams argued:

> That doesn't make sense for her to drive an hour to work on a weekend without getting paid, stay there for four or five hours doing treatment, and just charting that she did them when she didn't do them, especially with her being the director of nursing in the building trying to improve the building. . . . It was her job to come in there and do that. She's been in long-term care for 37 years. No one's ever made allegations like this. She didn't rise from a CNA to a DON through pretty much the pinnacle of the long-term care field for nursing with taking shortcuts like this or false charting or any of that that's been alleged, and so we would ask that you find that the state did not meet its burden of proof and that her name be cleared in this matter.

The ALJ stated that it would review the testimony and evidence, and the ALJ took the case under advisement.

On April 1, 2024, the ALJ issued a final administrative order upholding the true findings of neglect under Ark. Code Ann. § 12-12-1703(17)(B)(i) and (iii), which necessitated placement of McWilliams' name on the maltreatment registry. The ALJ found in paragraphs 1 and 2 of its findings of fact that C.L., R.A., and W.W. were residents of Legacy Health at the time of the occurrence and were therefore presumed to be impaired persons because they were residents of a long-term care facility. The ALJ found in paragraph 3 of its findings of fact that McWilliams was employed at Legacy Health as the director of nursing and had therefore assumed responsibility for the care and supervision of these residents by virtue of her employment. The ALJ made these findings in paragraphs 4 and 5:

4. **NEGLIGENT FAILURE TO PROVIDE NECESSARY TREATMENT, REHABILITATION, CARE, FOOD, CLOTHING SHELTER, SUPERVISION, OR MEDICAL SERVICES:**[3] I find that the Agency met its burden of proving that the Petitioner negligently failed to provide necessary care, supervision, and medical services to C.L., R.A., and W.W. when she failed to provide wound care to W.W. and R.A reflected by her in the charting records, and when she failed to carry out her nursing care functions as the D.O.N. which included oversight of nurses as well as residents' treatment, medications, and proper care. Her omissions equate to the failure to provide necessary care, supervision, and medical services and a person of ordinary prudence would have exercised greater care under the circumstances.

5. **NEGLIGENT FAILURE TO CARRY OUT A TREATMENT PLAN DEVELOPED OR IMPLEMENTED BY THE FACILITY:**[4] I find that the Agency proved by a preponderance of the evidence that the Petitioner negligently failed to carry out the treatment plans of R.A. and W.W. developed and implemented by the

---

[3]This finding tracks the language in Ark. Code Ann. § 12-12-1703(17)(B)(i).

[4]This finding tracks the language in Ark. Code Ann. § 12-12-1703(17)(B)(iii).

10

facility. Specifically, the credible evidence supports improper wound care for those two residents who gave statements that the Petitioner did not provide wound care to them as she indicated in the treatment records. Further, Holder reported the same to the Ombudsman and other staff prior to quitting. Holder also gave a statement indicating that when she returned to work following the weekend, the residents' bandages had not been changed.

In its order, the ALJ also entered conclusions of law that contained more findings in support of its decision on each issue. Paragraph 4 of the ALJ's conclusions of law asked the question: "Did Petitioner negligently fail to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered person or an impaired person?" to which the ALJ answered yes. In that paragraph, the ALJ specifically found that that McWilliams' testimony regarding her charting and her wound care was "simply not credible." The ALJ found further that DHS presented credible evidence that McWilliams failed to provide wound care to at least two residents as she had indicated in the treatment records. Paragraph 5 of the ALJ's conclusions of law asked the question: "Did Petitioner negligently failed to carry out the treatment plan developed and implemented by the facility?" to which the ALJ answered no. However, it is patently obvious that this was a clerical error because in paragraph 5 of the ALJ's findings of fact it had already answered this question in the affirmative with specific findings in support. Moreover, in the ALJ's additional discussion in paragraph 5 of the conclusions of law, the ALJ found:

Based upon the credible evidence, I find that the Agency met its burden of proving that the Petitioner failed to carry out the treatment plans of R.A. and W.W. who gave statements during the investigation that their wounds were not being changed as ordered. Both residents had high cognitive scores and certainly would know if the Petitioner had changed their wound dressings as many times as she claimed to have done so. The Petitioner charted that she provided wound care to W.W. five times,

11

and W.W. denied that she did any wound care. The Petitioner charted that she provided wound care to R.A. seven times, and R.A. stated that she did so once. I did not find the Petitioner credibly testified regarding her charting. Furthermore, Holder's statement regarding the residents' bandages not being changed over the weekend corroborates the residents' statement.

Pursuant to the ALJ's finding of neglect against McWilliams, it ordered that her name be placed on the maltreatment registry.

## IV. *The Circuit Court Proceedings*

On April 26, 2024, McWilliams timely filed a petition for judicial review in the Pulaski County Circuit Court. On January 16, 2025, McWilliams filed a brief in support of her petition.

In McWilliams' brief filed in the circuit court, she made an entirely new argument that she did not raise in the administrative proceeding before the ALJ. McWilliams argued, for the first time, that the ALJ incorrectly found that McWilliams violated a duty of care that she did not owe. McWilliams premised this argument on various provisions in the Arkansas Administrative Code pertaining to nursing homes. McWilliams attempted to distinguish between the duties and responsibilities of a director of nursing (which was her position with Legacy Health) and a charge nurse. Arkansas Administrative Code 016.25.2-511.3 provides that a director of nursing services shall be responsible for such things as development and maintenance of nursing service objectives, scheduling of daily rounds to see patients, methods for coordination of nursing service with other patient services, nursing staff development, and supervision of nursing documentation. 016.25.2-511.3 Ark. Admin. Code (WL current through July 15, 2025). A charge nurse's duties are more resident-focused

and include such things as delegating responsibility for the direct care of specific patients to the nursing staff based on the need of the patient, observation of work performance in the delivery of direct care, administration of medication if there is no assigned medication nurse, and giving shift reports to an oncoming shift of caregivers. 016.25.2-512.3 Ark. Admin. Code. Arkansas Administrative Code 016.25.2-512.4 provides, "The Director of Nursing Services shall not serve as charge nurse in a skilled nursing facility with an average daily total occupancy of seventy-one (71) or more patients." In her brief, McWilliams stated that because Legacy Health is a skilled nursing facility with 115 beds, Ark. Admin. Code 016.25.2-512.4 prohibited her from acting in a hybrid position of both the director of nursing and charge nurse. McWilliams thus posited that she had only an administrative role at the facility. McWilliams argued—despite the fact that that she is a registered nurse; that her written job duties specifically required her to provide direct nursing care as necessary; and she testified before the ALJ that she was in fact administering direct wound care to patients on weekends in compliance with her job duties—that none of her duties included providing direct patient care as dictated by the administrative regulations. McWilliams thus argued that the ALJ applied the wrong standard of care applicable to a charge nurse instead of the correct standard of care applicable to a director of nursing and that the ALJ's decision should be reversed on those grounds.[5]

---

[5]In her brief to the circuit court, McWilliams also argued that even if she was required to administer direct care, the ALJ's decision was not supported by substantial evidence because she was administering the care that she documented on the TAR. McWilliams attached a form signed by resident W.W. stating, "I have been receiving my treatments as

13

On March 25, 2024, a hearing was held before the circuit court wherein the parties made their respective arguments. At the hearing, McWilliams reiterated her argument in her brief to the circuit court that the ALJ had applied the wrong standard of care. DHS countered that, in the administrative proceedings before the ALJ, it was undisputed that McWilliams was in the position of a caregiver as set forth in her written job description and in her own testimony. At the conclusion of the hearing, the circuit court took the matter under advisement.

On April 3, 2025, the circuit court entered an order reversing the ALJ's administrative decision. The circuit court found that pursuant to the administrative regulations cited in McWilliams' brief to the court, as a director of nursing, she did not have the same duties as a charge nurse, but the ALJ found her negligent for breaching that duty. The circuit court ruled that because the ALJ's order was made under an erroneous standard of care and in violation of statutory provisions, the final administrative order must be reversed and vacated and McWilliams' name removed from the maltreatment registry.

DHS timely appealed the circuit court's decision to the court of appeals.

V. *DHS's Arguments on Appeal*

On appeal to this court from the circuit court's decision that reversed the ALJ, DHS makes three arguments: (1) the ALJ's decision was supported by substantial evidence, (2) the

---

ordered." She also attached a form indicating that R.A. "stated that he has been getting his treatments but didn't want to sign."

ALJ's decision was not arbitrary or capricious, and (3) the circuit court erred in reversing the ALJ's order. We agree that the ALJ's decision was supported by substantial evidence and was not arbitrary and capricious, and we affirm the ALJ's administrative order and reverse the circuit court's order.

As we previously stated, our review under the APA is directed not toward the circuit court but toward the decision of the administrative agency. *See Baldwin*, *supra*. The appellate court may reverse or modify an agency's decision if it concludes that the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error or law; (5) not supported by substantial evidence of record; or (6) arbitrary, capricious, or characterized by abuse of discretion. Ark. Code Ann. § 25-15-212(h). Our review is limited to ascertaining whether there is substantial evidence to support the agency's decision or whether the agency's decision runs afoul of one of the other criteria set out in the APA. *Pegasus Renovation Co.*, *supra*.

Having reviewed the record, we conclude that the ALJ's decision was supported by substantial evidence and did not run afoul of any of the criteria in the APA. There was evidence at the administrative hearing that between April and May 2023, Legacy Health residents R.A. and W.W. had daily orders for wound care and that both of these residents stated they were not receiving their wound care on the weekends, despite McWilliams indicating on the TAR that these treatments were being given. Specifically, McWilliams had

documented seven wound-care treatments for R.A., yet R.A. stated that McWilliams had performed the treatment "maybe once," while McWilliams documented five treatments on W.W., who stated McWilliams had performed none of the treatments. Nurse Holder, who was employed at the facility and worked during the week, corroborated the residents' accounts by confirming that when she would return to work after the weekend, the bandages had not been changed. Moreover, two certified nursing assistants stated during the investigation that they had seen Holder administering wound care but not McWilliams.

The ALJ found that McWilliams had committed "neglect" pursuant to Ark. Code Ann. § 12-12-1703(17), which is defined as:

> (B) An act or omission by a caregiver responsible for the care and supervision of an endangered person or an impaired person constituting:
>
> (i) Negligently failing to provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an endangered person or an impaired person;
>
> . . . .
>
> (iii) Negligently failing to carry out a treatment plan developed or implemented by the facility[.]

Although McWilliams' testimony conflicted with that of the residents and Holder, in its order, the ALJ specifically found McWilliams not credible, and it was for the ALJ to decide issues of credibility. *See Williams*, *supra*. We hold that the ALJ's finding of neglect was supported by substantial evidence. Moreover, when the agency's decision is supported by substantial evidence, it automatically follows that it cannot be classified as unreasonable or arbitrary. *Collie*, *supra*.

In McWilliams' appellate brief, she correctly notes that there is a discrepancy in the ALJ's order in that it found that McWilliams negligently failed to carry out the treatment plans of R.A. and W.W. developed and implemented by the facility but then answered no to the question "Did Petitioner negligently failed to carry out the treatment plan developed and implemented by the facility?" However, as we have already explained, on the basis of the remaining specific and extensive findings made by the ALJ in its order, it is clear that this was a mere clerical error, and there can be no doubt the ALJ found that McWilliams had negligently failed to carry out the treatment plan. Therefore, this discrepancy provides no ground for reversal of the ALJ's order.

Finally, we observe that McWilliams argues in this appeal that the ALJ used an improper standard of care for a director of nursing in light of the provisions in the Arkansas Administrative Code pertaining to nursing homes. McWilliams argues that because her job duties were exclusively administrative and did not include direct nursing care, the ALJ erred in applying the standard of care applicable to a charge nurse. However, it is undisputed that McWilliams' written job description, signed by McWilliams, required her to provide direct nursing care as necessary, and McWilliams did not raise this argument to the ALJ during the administrative proceedings. It is well settled that we will not set aside an administrative determination on a ground not presented to the administrative agency because to do so would deprive the agency of the opportunity to consider the matter, make its ruling, and state the reasons for its action. *Lamar Co., LLC v. Ark. State Highway & Transp. Dep't*, 2011 Ark. App. 695, 386 S.W.3d 670. This preservation rule applies even though McWilliams

17

raised the issue in the circuit court. *See id.* Because McWilliams failed to raise this issue before the administrative agency, it cannot be now addressed on appeal.

VI.  *Conclusion*

For the reasons stated herein, we affirm the ALJ's decision that placed McWilliams' name on the maltreatment registry based on its finding of neglect against McWilliams because she was negligent in her responsibility of caring for long-term-care-facility residents. Because we affirm the ALJ's decision, the circuit court's order overturning that decision is reversed.

Agency decision affirmed; circuit court decision reversed.

ABRAMSON and MURPHY, JJ., agree.

*Brooke D. Cummings*, Ark. Dep't of Hum. Servs., for appellant.

*Wright, Lindsey & Jennings LLP*, by: *Quinten J. Whiteside* and *Caroline E. O'Connor*, for appellee.